UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| RICKY D. PERSOHN, | ) | |
| (Social Security No. XXX-XX-2366), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 3:04-cv-63-RLY-WGH |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM  DECISION AND ORDER

Plaintiff, Ricky D. Persohn, seeks judicial review of a final decision of the agency,

which found him not disabled and, therefore, not entitled to Disability Insurance Benefits

("DIB") under the Social Security Act ("the Act").  42 U.S.C. §§ 416(i), 423(d); 20 C.F.R. §

404.1520(f).  The Court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g).

For the following reasons, the decision of the Commissioner is **AFFIRMED.**

### I.  Statement of the Case

On May 3, 2002, Plaintiff applied for DIB alleging disability since December 31,

1999.[1]  (R. 66-73).  Following administrative denials (R. 40-43, 45-46), Plaintiff,

represented by a non-attorney representative and a vocational expert ("VE"), appeared and

testified at a hearing before Administrative Law Judge ("ALJ") Anne C. Pritchett on

---

[1]Plaintiff filed prior applications for DIB on May 25, 2000 (R. 59-61) and June 6, 2001
(R. 62-64) which were denied at the initial levels on October 26, 2000 (R. 32-35) and October
18, 2001 (R. 36-39), respectively, and not further appealed.

November 6, 2003.  (R. 333-59).

On November 24, 2003, the ALJ denied Plaintiff's claim.  (R. 14-24).  In her decision, the ALJ discussed the medical and other evidence in detail.  (R. 18-23).  After reviewing the evidence, the ALJ concluded that Plaintiff had the following medically determinable severe impairments:  a personality disorder with cluster "B" traits; anxiety; post-traumatic stress disorder; alcohol abuse in early sustained remission; and degenerative disc disease status-post two surgeries.  (R. 24).  She concluded that none of these impairments, singly or in combination, met or equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 21-22, 24).  The ALJ further found that Plaintiff's impairments restricted him to a limited range of light work in a low stress environment without stringent speed or production requirements and no more than occasional interaction with supervisors and co-workers but no interaction with the public.  (R. 23-24, 356).  Based on vocational testimony, the ALJ concluded that Plaintiff could perform his past relevant job as a church janitor.  (R. 23-24).  Therefore, the ALJ found that Plaintiff was not disabled within the meaning of the Act.  (R. 23-24).  *See* 20 C.F.R. § 404.1520 *et seq.* (outlining the Commissioner's five-step sequential evaluation).

The Appeals Council denied Plaintiff's request for review of the ALJ's decision (R. 6-8) and the ALJ's decision stands as the Commissioner's final decision in this matter.  *See* 20 C.F.R. §§ 404.955, 404.981.  Plaintiff seeks judicial review under authority of 42 U.S.C. § 405(g).

## II.  Statement of Facts

**A.     Vocational Profile**

Plaintiff, who was 46 years old on the date of the ALJ's decision, had a high school equivalent education and past relevant work in security/maintenance for a motel, handyman, janitor, saw mill laborer, and guard.  (R. 90, 338-41).  Plaintiff alleged disability since December 31, 1999, due to anxiety with agoraphobia, post-traumatic stress disorder (PTSD), and back problems.  (R. 89).  Since his alleged onset of disability, the record shows that Plaintiff worked in security/maintenance for Holiday Inn from July 3, 2000, to October 2, 2000, and as a factory laborer through a temporary agency from February 1, 2001, to March 15, 2001.  (R. 101-07).  These work activities were considered unsuccessful work attempts. (R. 18, 107).  The ALJ noted that the record additionally showed that in the year 2000, Plaintiff received income from several other short-term temporary jobs, but concluded that they did not rise to a level commensurate with substantial gainful activity.  (R. 18).

**B.     Medical Evidence**

The record confirms that Plaintiff had a history of back problems and psychological problems that pre-dated his alleged onset of disability.  In 1992, seven years before Plaintiff's alleged onset date, he underwent a microdiscectomy; he experienced a recurrence of symptoms and, about a year later, on March 29, 1993, he underwent redo surgical procedures.  (R. 196).  By September 1994, Paul K. Gardner, M.D., Plaintiff's neurosurgeon, reported that Plaintiff had pain when "overdoing" any activity, but was doing reasonably well and walked a mile a day.  (R. 203).

On August 4, 1998, before his alleged onset date, Marianna Pardue, M.D., diagnosed plaintiff with PTSD and panic disorder with agoraphobia.  (R. 216-18).  February 16, 1999 treatment notes from Dr. K.D. Roberts reflect that Plaintiff was working as a janitor and reportedly doing well on his medications, including Valium.  (R. 222).

There were no records that Plaintiff was receiving treatment for either condition around December 1999, when he alleged he became disabled.

The records from Dr. Roberts first indicate Plaintiff is suffering from "chronic back pain" in March 2000.  (R. 219).  However, that report indicates that he has taken Valium "for many years" and "[h]as stayed steady on his dose; does well as long as he takes his medication."

The first records that he received any treatment for his mental condition occurred on June 5, 2001, about one and one-half years after Plaintiff's alleged onset date, when Jennifer Weisheit, MSW, LCSW, a psychiatric social worker at the Memorial Counseling Center, evaluated Plaintiff.  (R. 287-88).  Plaintiff told her that he had difficulty being in crowds of people, but that his symptoms had improved when he returned to his home area.  (R. 287). Ms. Weisheit diagnosed PTSD and panic disorder with agoraphobia and referred Plaintiff for further counseling.  (R. 287-88).  In July 2001, Ms. Weisheit noted that Plaintiff had legal problems in Colorado, where he was on probation, and that he was consuming alcohol while continuing to take Valium.  (R. 286).

On August 15, 2001, at the request of the agency, Jeffrey W. Gray, Ph.D., performed a consultative mental examination of Plaintiff.  (R. 240-43).  Plaintiff exhibited some restlessness and hypervigilance, but his affect was appropriate, he had average intellectual

ability, and his attention span and concentration were mildly to moderately impaired.  (R. 242).  Dr. Gray opined that Plaintiff would have a great deal of difficulty with complex and detailed types of tasks and would have problems doing simple types of tasks on a consistent basis.  (R. 242-43).  Dr. Gray also opined that Plaintiff would have some difficulty consistently handling work-like stresses or being reliable, as well as some difficulty remembering work rules and solving problems.  (R. 242, 243).  He believed Plaintiff had a moderate degree of difficulty relating to co-workers and interacting with supervisors.  (R. 242-43).  He diagnosed PTSD, panic disorder with agoraphobia.  (R. 243).

On September 8, 2001, at the request of the agency, Brian S. Sanders, M.D., performed a consultative evaluation.  (R. 244-46).  Plaintiff reported chronic pain and exhibited slightly decreased range of motion in his dorsolumbar spine, but he ambulated well; had a normal neurological examination, with intact strength, sensation and reflexes; normal grip strength; normal fine finger movement.  (R. 244-45).  Dr. Sanders opined that Plaintiff could perform work that did not involve heavy labor or prolonged sitting or standing.  (R. 245).

Plaintiff clearly sought on-going treatment for his back condition first on October 11, 2001, nearly two years after his alleged onset date, when he saw James Gruber, M.D., who stated that Plaintiff primarily saw him for medication refills.  (R. 265, 268).  On May 23, 2002, Dr. Gruber reported that he had seen Plaintiff on only two occasions and that according to his notes and Plaintiff's history, Plaintiff had a history of chronic anxiety, chronic osteoarthritis and chronic back pain, but that he could not comment on any limitations as a result.  (R. 265).

On July 18, 2002, Dr. Gruber reported that he saw Plaintiff a third time when he came in for a disability physical.  (R. 263).  Dr. Gruber reported that the physical examination disclosed no significant abnormalities.  (R. 264).  On musculoskeletal examination, Plaintiff had no tenderness over his back; was able to squat down; and had no significant limitations in spinal motion.  (R. 264).  Dr. Gruber also reported that Plaintiff had intact reflexes in his arms and legs.  (R. 264).  Dr. Gruber stated that Plaintiff was on a high dose of Valium, but Dr. Gruber did not feel comfortable increasing Plaintiff's Valium even though Plaintiff wanted him to.  (R. 264).  He diagnosed chronic low back pain and felt uncomfortable continuing to provide Valium or any other narcotic.  (R. 264).  Because he had seen Plaintiff on only three occasions (in a nearly three-year period), Dr. Gruber declined to render an opinion of disability and referred him to Randall L. Oliver, M.D.  (R. 264).

Plaintiff underwent treatment from August 2001 until June 2002 at the Southern Hills Mental Health Center.  (R. 247).  On June 19, 2002, the treatment team at this mental health center completed a report which was signed by David Gray, M.D., and by another member (signature is illegible) of the treatment team, who was the reporting source.  (R. 252).  In this report, the treatment team stated that Plaintiff had been seen on a monthly basis for almost a year (August 2, 2001, to June 14, 2002).  (R. 247).  It was noted that Dr. Gruber was Plaintiff's current treating family physician.  (R. 247).  The team reported that Plaintiff stated that he could not get along with people and could not deal with them.  (R. 247).  The treatment team reported that Plaintiff had appropriate and cooperative behavior, that his speech was logical and relevant, and that there were no examples of destructibility.  (R.

248).  Plaintiff arrived alone for his appointments and drove approximately 20 miles in his own truck to his appointments.  (R. 248).  Plaintiff reported vague symptoms of anxiety, flashbacks of past physical abuse in childhood, excessive worry, intense anger, and rumination.  (R. 248).  Plaintiff also reported a history of withdrawal treatment.  (R. 248).  Plaintiff had little insight and felt that he needed more drugs.  (R. 248).  Plaintiff also reported legal entanglements related to alcohol and was currently on probation.  (R. 248).  He reported little current usage.  (R. 248).  Plaintiff tended to isolate himself from others and had few interpersonal relationships.  (R. 248).  On mental status testing, his recent and remote memory was intact and his general fund of knowledge was intact and above average. (R. 249).  His performance on mental status testing was normal; he had good concentration; little frustration and good processing speed.  (R. 250).  The team diagnosed PTSD by history; benzodiazepine dependence, in partial remission; and alcohol abuse, in partial remission.  (R. 247).

On September 13, 2002, Mehmet Akaydin, M.D., performed a consultative evaluation.  (R. 254-59).  Dr. Akaydin reported completely unremarkable cognitive, physical, and neurological examinations.  (R. 255-57).  He opined that Plaintiff could perform mildly to moderately strenuous activities given his generally intact cognitive and physical/orthopedic status.  (R. 258).

On February 3, 2003, Dr. Oliver evaluated Plaintiff.  (R. 272-76).  Plaintiff had 4/4 reflexes in his legs and full strength at 5/5.  (R. 275).  His gait and station were within normal limits and he could perform a full squat.  (R. 275).  He exhibited some limitations in range of back motion, but had negative straight leg raise and could stand and sit without

difficulty.  (R. 275).  He identified no lifting, sitting, or walking restrictions.  (R. 275).

Plaintiff continued to treat with Dr. Oliver between February and April 16, 2003.  (R. 297-

308).  Plaintiff often reported pain in his back with an intensity of "5/10" and frequency of

"comes and goes" (R. 302, 306), to "6/10" and "constant" in April 2003 (R. 298).

On March 3, 2003, Mark Luff, M.D., reported that he had seen Plaintiff since January

2003.  (R. 292).  Dr. Luff opined that Plaintiff would not do well in any job requiring

strenuous labor or excessive lifting, pushing, pulling, bending, or stooping.  (R. 293).  He

opined that his mental impairments would limit him from jobs that were high stress. (R.

293).

On July 7, 2003, pursuant to court-ordered therapy, plaintiff reported to Ms.

Weisheit, his therapist, that he was doing much better and that things were much better

between him and Marilyn, his girlfriend.  (R. 318).  He was under house arrest, but could

walk outside twice a day, and he had been exercising which made him feel much better.  (R.

318).  Plaintiff also told Ms. Weisheit that he had obtained a driver's license and had

stopped drinking alcohol.  (R. 318).  Plaintiff reported an improved mood, and he was much

more focused.  (R. 318).  Plaintiff had appropriate affect and did not seem anxious, and he

stated that he planned to continue in therapy even after he was no longer court-ordered to do

it.  (R. 318).  He had some difficulty sleeping, but with the new medication regimen, he was

improving.  (R. 318).

On August 8, 2003, Plaintiff reported frustration regarding Dr. Luff's refusal to

increase his Tranxene (for anxiety) medication.  (R. 314).  Ms. Weisheit noted that Plaintiff

was somewhat anxious, but continued to attend AA meetings and had actually attended

more than had been required by the court.  (R. 314-15).  He was sleeping well, despite his anxiety.  (R. 315).

On September 9, 2003, Plaintiff reported to Ms. Weisheit that he was doing much better.  (R. 310).  His house detention had been reduced, and he was allowed two hours out in the morning and two hours out in the evening.  (R. 310).  During this time, Plaintiff stated that he went to the park, walked around, and felt much better.  (R. 310).  Plaintiff also told his therapist that he was concerned about an upcoming hearing with Social Security.  (R. 310).  He continued to be drug and alcohol free and had been attending AA meetings.  (R. 310).  Ms. Weisheit reported that Plaintiff's affect was slightly anxious.  (R. 311).

On October 27, 2003, Plaintiff reported that he took Valium for six years until March 2003, when his medications were all changed.  (R. 327).  As of this date, Plaintiff took Restoril for insomnia, Tranxene for anxiety, and Flexeril and Naproxen for muscle spasms.  (R. 327).

## C.   Vocational Expert Testimony

At the hearing, the ALJ asked a VE a hypothetical question based on Plaintiff's age, education, and work experience that assumed that Plaintiff could lift 20 pounds occasionally and ten pounds frequently; could work a low stress environment that did not involve stringent speed or production requirements; could tolerate occasional interaction with supervisors and co-workers, but no interaction with the public, and could not perform skilled work.  (R. 356).  In response, the VE testified that such a hypothetical person could perform his past job as a janitor at a church.  (R. 357).  The VE repeated that, given the limitations in the hypothetical question, Plaintiff could still perform his past job as a janitor at a church.

(R. 357).  The VE estimated that a minium of 1,000 church janitor jobs existed within a 200 mile radius.  (R. 357).  In addition, the VE testified that there would be numerous other light jobs that accommodated the limitations of the hypothetical question.  (R. 357).

## III.  Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401 (1971); see also *Perkins v. Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997).  This standard of review recognizes that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility.  *Richardson,* 402 U.S. at 399-400.  Accordingly, this Court may not re-evaluate the facts, weigh the evidence anew or substitute its judgment for that of the Commissioner. *See Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999).  Thus, even if reasonable minds could disagree about whether or not an individual was "disabled," the Court must still affirm the ALJ's decision denying benefits.  *Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir. 2000).

## IV.  Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that he suffers from a "disability" as defined by the Act.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §

423(d)(1)(A).  The Social Security regulations set out a sequential five-step test the ALJ is to perform in order to determine whether a claimant is disabled.  *See* 20 C.F.R. § 416.920. The ALJ must consider whether the claimant:  (1) is presently employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or equals an impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) is unable to perform his past relevant work; and (5) is unable to perform any other work existing in significant numbers in the national economy.  *Id.*  The burden of proof is on Plaintiff during steps one through four, and only after Plaintiff has reached step five does the burden shift to the Commissioner.  *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000).

## V.  The Issues

Plaintiff raises the following issues in his brief:

1.  Are the Plaintiff's impairments of severe back pain equivalent to a listed impairment?

2.  Is the ALJ's credibility assessment proper in this case?

3.  Did the ALJ properly evaluate Plaintiff's mental impairments?

4.  Did the ALJ err in concluding that Plaintiff could perform his past relevant work when the Commissioner had previously issued a document indicating that Plaintiff could not do his past relevant work?

5.  Is the ALJ's decision that Plaintiff possessed the residual functional capacity to return to his past work supported by substantial evidence?

6.  Did the ALJ confuse the reports of David Gray, M.D., and Jeffrey Gray, Ph.D., to

-11-

an extent that renders the ALJ's decision incorrect?

7.  Did the ALJ fully and fairly develop the record?

**Issue 1:      Are the Plaintiff's impairments of severe back pain equivalent to a listed impairment?**

Plaintiff asserts that the ALJ did not adequately consider his impairments in combination before concluding that he did not have a listing-level impairment.  (*See* Plaintiff's Brief ("PB") at 2.  Plaintiff refers to his chronic back pain, but fails to cite any particular listing nor does he cite any specific medical findings that were of equal severity to a listed impairment.  (PB at 1-2.  It is well-settled that Plaintiff bears the burden of furnishing proof, in the form of medical evidence, to support his claim that he had an impairment that met or equaled the criteria of a listing.  *See* 42 U.S.C. § 423(d)(5)(A) (providing that an individual must furnish medical and other evidence to establish disability); 20 C.F.R. § 404.1512(a) (providing that a claimant has to prove he is disabled); *Howell v. Sullivan,* 950 F.2d 343, 348 (7th Cir. 1991) (holding that the claimant bears the responsibility of providing medical evidence of his impairments); *Johnson v. Heckler,* 741 F.2d 948, 953 (7th Cir. 1984) (holding that a claimant must prove, using medically acceptable clinical and laboratory findings, that she has become unable to engage in substantial gainful activity by reason of a physical or mental impairment); *see also Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987) (providing that the claimant has the burden of proof through the first four steps of the sequential evaluation).

Here, Plaintiff claims that the ALJ ignored or misstated evidence, but Plaintiff makes no attempt to support his assertion that he had a listing-level impairment with reference to the specific medical requirements of any specific listing.  In addition, except for cites to various portions of the record which document his complaints of back pain, including his own subjective descriptions, he fails to cite any specific objective medical evidence which meets or equals in severity the requirements of any specific listing.  *Cf. Laborers' Intern. Union of North America, AFL-CIO v. Foster Wheeler Energy Corp.,* 26 F.3d 375, 398 (3rd Cir. 1994) (providing that a passing reference to an issue without discussion does not bring issue before court); *U.S. v. Zannino,* 895 F.2d 1, 17 (1st Cir. 1990), *cert. denied,* 494 U.S. 1082 (1990) (explaining the "settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). His argument is therefore without merit.

Moreover, a review of the relevant listings reveals that Plaintiff does not satisfy the criteria of a listed impairment.  As discussed, Plaintiff does not cite a single listing, but Listing 1.04 is the only relevant listing that concerns disorders of the spine.  Listing 1.04A requires medical findings showing disorders of the spine resulting in compromise of a nerve root or spinal cord with evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness) accompanied by sensory or reflex loss, and positive straight leg-raising test, both sitting and supine.  Listing 1.04A.  Here, however, there was no evidence whatsoever that Plaintiff's degenerative disc disease resulted in nerve compression, or any motor, reflex, or sensory loss (*see, e.g.,* Dr. Gruber at R. 265; Dr.

Sanders at R. 244-45; Dr. Oliver at R. 275; Dr. Akaydin at R. 255-57 ).  None of these physicians reported any nerve root compromise, and they uniformly reported that while Plaintiff exhibited varying degrees of limited range of spinal motion, he generally had full motor strength and no evidence whatever of any significant motor loss or reflex or sensory abnormalities.  (*Id.*)  The record fails to show that Plaintiff's back resulted in sufficiently severe medical findings to meet or equal the requirements of Listing 1.04 for spinal disorders, or for any other listed impairment.  The ALJ committed no error in this regard.

**Issue 2:**      **Is the ALJ's credibility assessment proper in this case?**

With respect to the ALJ's credibility assessment, the ALJ does refer to the appropriate Social Security Rulings to consider in her opinion.  (R. 22).  The ALJ's decision does include an extensive description of the objective medical evidence as to Plaintiff's condition and with respect to his physical complaints of pain upon sitting, bending, and squatting.  Upon our review, the medical evidence discussed by the ALJ does not support the degree of severity alleged by Plaintiff.  (*See* R. 18-21 referring to Dr. Gruber at R. 265; Dr. Sanders at R. 244-45; and Dr. Oliver at R. 275).

The ALJ also considered Plaintiff's mental impairments.  Specifically, the ALJ noted that while the Plaintiff reported psychiatric symptoms prior to his date of onset, the notes of Kevin D. Roberts, M.D., in February 1999 (closet to the onset date) show that Plaintiff was able to successfully complete his work as a church janitor while on a combination of psychiatric medications.  (R. 19).  The ALJ then extensively referred to the records of Memorial Hospital and Healthcare Psychiatric Physician Practice.   These records indicate that Plaintiff was not initially diagnosed or treated for a mental health impairment until May

-14-

2001, some 18 months after his alleged date of disability.  (R. 291).  As early as June 5, 2001, the records indicate some improvement in Plaintiff's condition.  (R. 287).  These records do not support Plaintiff's representation as to the extent of his anxiety-related symptoms and are substantial evidence to support the ALJ's decision that Plaintiff's description of the degree of his mental impairment was not fully credible.  There is no error in the ALJ's credibility assessment, and there is no showing that the ALJ's assessment was patently in error.

**Issue 3:       Did the ALJ properly evaluate Plaintiff's mental impairments?**

With respect to Plaintiff's mental impairments, the ALJ concluded that Plaintiff did have the severe mental impairments of a personality disorder with cluster "B" traits, anxiety, post-traumatic stress disorder, and alcohol abuse in early sustained remission.  The ALJ discussed all the medical evidence that related to psychological conditions in her opinion. (R. 18-23).  Specifically, the ALJ discussed whether Plaintiff's psychological impairments met the listing of impairments at 12.06, 12.08, and 12.09.  (*See* R. 22).

The Court has reviewed the records concerning Plaintiff's mental health treatment. Specifically, the Court notes that while Marianna G. Pardue, M.D., did diagnose Plaintiff with post-traumatic stress disorder, a panic disorder with agoraphobia, and a Global Assessment of Function ("GAF") of 50 in August 1998, she also found Plaintiff to be "fairly stable" at the time of her opinion.  (R. 217).  Dr. Pardue specifically suggested that a rehabilitation counselor "can also guide him in finding job training or placement that would be beneficial for him with his arthritis and also work well for him with his post-traumatic stress disorder and his panic disorder."  (R. 218).  The opinion of Dr. Pardue does not,

therefore, seem to indicate that Plaintiff could not be gainfully employed, even at the time of her examination.

In addition to Dr. Pardue's report, the office notes of Kevin D. Roberts, M.D., who appears to be a family physician, indicates that on February 16, 1999 (the time closest to the alleged onset of disability) the Plaintiff "reports he is doing well . . . [c]urrently employed in the janitorial field."  Dr. Roberts did not suggest that Plaintiff was unable to continue employment from a psychological or physical point of view.  (R. 222).

As the ALJ noted, the next time that Plaintiff was evaluated was on June 5, 2001, by Jennifer Weisheit, the psychiatric social worker.  While Ms. Weisheit also found Plaintiff to be diagnosed with post-traumatic stress disorder and panic disorder with agoraphobia and a GAF of 50 (a borderline determination between serious and moderate symptoms), the ALJ did indicate that that diagnosis was based upon an initial interview and not on long-term treatment.  (R. 287).  That document also indicates that Plaintiff's symptoms "have begun to improve" since his return to this area.

The ALJ also noted and discussed the examination of consulting neuro-psychologist, Jeffrey W. Gray, Ph.D., on August 15, 2001.  While Dr. Gray's diagnosis was very similar to Ms. Weisheit's diagnosis, the ALJ specifically advises us that she felt greater weight should be given to the opinion of David Gray, M.D., who had the benefit of a more extensive period of observation with Plaintiff.

This Court has reviewed the Plaintiff's records at the Southern Hills Mental Health Center on a monthly basis between August 2, 2001, and June 14, 2002.  It is clear that Dr. David Gray was a part of the treatment team.  (R. 247, 252).  The ALJ's determination to

accept the current GAF of 60 (indicating mild to moderate symptoms) as more reliable when based on monthly visits over a period of ten months is a rational basis for giving greater weight to the opinion of Dr. David Gray and his treating team than that of Ms. Weisheit or psychologist Jeffrey Gray.

Based upon this evaluation, the Court concludes that the ALJ properly evaluated whether Plaintiff's mental conditions met or equaled a listing, and her conclusion, at page 22 of the record, that Plaintiff's mental status did not meet or was not equivalent to a listed impairment is supported by substantial evidence.  In addition, the ALJ took Plaintiff's mental capacities into account when she asked an appropriate hypothetical question to the VE at the hearing.  (*See* R. 356).  In that hypothetical, the ALJ assumed that Plaintiff would be required to work in a low stress environment without stringent speed or production requirements; that he could tolerate only occasional interaction with supervisors and co-workers, but could not tolerate contact with the public.  Based upon that assumption, Dr. Mehaffey, the VE, found that "well, janitor of the church could probably be done other that. He could still be a janitor at a church."  (R. 357).  The VE further testified that there would be approximately 1,000 church janitors within a 200 mile radius.  (R. 357).

This Court, therefore, concludes that the ALJ properly assessed Plaintiff's mental capacity, correctly concluded that his mental condition did not meet or equal any listed impairment, and reasonably concluded that he was able to perform his past job as a church janitor notwithstanding his mental impairments.

**Issue 4:**     **Did the ALJ err in concluding that Plaintiff could perform his past relevant work when the Commissioner had previously issued a document indicating that Plaintiff could not do his past relevant work?**

Plaintiff argues at pages 5 and 6 of his brief that, as a part of an initial denial of his current application, the Commissioner concluded that he could not perform his prior work. (R. 37).  Plaintiff does not, however, cite to any portions of the Code of Federal Regulations that establish that a conclusion reached in an initial consideration phase of the application process collaterally estops the Commissioner from a different decision in a later stage of the process if the records are more fully complete, and after an ALJ hearing.  In the absence of any authority establishing that the initial conclusion remains legally binding upon the Commissioner, the Court declines to conclude that the ALJ erred by deciding the matter differently.

**Issue 5:**     **Is the ALJ's decision that Plaintiff possessed the residual functional capacity to return to his past work supported by substantial evidence?**

The Court concludes that substantial evidence does support the ALJ's residual functional capacity determination.  With respect to Plaintiff's physical condition, the Court notes that Plaintiff's back surgeries included a microdiscectomy in late 1992 and a secondary procedure in March 1993.  (R. 18-19).  Although some of the records indicate occasional exacerbations, Plaintiff continued to work through and including December 1999.  Therefore, the objective evidence shows that the surgical procedures themselves did not prohibit Plaintiff from being able to perform the functions of his past employment.  The medical records closest to Plaintiff's onset date that relate to his back condition are the notes of treatment on February 16, 1999, and these records indicate that Plaintiff was currently employed in the janitorial field.  (R. 222).  Records of later treatment by the same physician

-18-

show occasional elbow problems, but no further treatment for his back.  This lack of treatment suggests that at the point in time closest to his alleged date of onset, Plaintiff's back condition did not prohibit him from performing light work and the prior janitorial job as the ALJ concluded.

With respect to Plaintiff's mental impairments, the ALJ concluded that after Plaintiff changed medications and participated in therapy and AA meetings on a regular basis, the evidence showed that his anxiety-related symptoms improved.  (*See* R. 22).  The evidence which supports that conclusion includes the reports from Ms. Weisheit (R. 310, 315, 318) that plaintiff showed improvement.  By September 2003, records indicate that Plaintiff was only slightly anxious.  (R. 311).  These pieces of evidence are substantial evidence upon which the ALJ could rely to determine that Plaintiff could perform a limited range of light work, and thus his prior past relevant work as a church janitor, despite some anxiety problems.

The ALJ asked a VE a hypothetical question that incorporated the appropriate residual functional capacity determination (R. 356), and in response, the VE testified that Plaintiff could perform one of his jobs as a church janitor (R. 357).  This evidence constitutes substantial evidence to support the ALJ's decision.

Therefore, the Court concludes that the ALJ's decision that Plaintiff possessed the residual functional capacity to perform a limited range of light work and to return to his prior work as a janitor is supported by substantial evidence.

**Issue 6:      Did the ALJ confuse the reports of David Gray, M.D., and Jeffrey Gray, Ph.D., to an extent that renders the ALJ's decision incorrect?**

Plaintiff alleges that the ALJ confused the medical records of Jeffrey Gray, Ph.D., with those of David Gray, M.D. (PB at 8-9). However, this Court does not believe that the ALJ confused this testimony.

On page 19 of the record, the ALJ clearly establishes that Plaintiff underwent a mental status examination at the request of the State Disability Determination Service by Jeffrey W. Gray, Ph.D. The ALJ specifically discussed the fact that Dr. Jeffrey Gray's opinion was based upon only one examination. (R. 20). The ALJ did give greater weight to the assessment of a treating psychiatrist, David Gray, M.D., because of the more extended period of observation. While Plaintiff contends that he did not see Dr. David Gray, the notes and discussion by the ALJ (R. 20) established that Dr. Gray was a part of a treatment team that saw Plaintiff on a monthly basis beginning in August 2001 to June 2002. (*See* R. 247, 252). The ALJ could reasonably rely on the report and information of the Plaintiff's treatment rendered by the team headed by Dr. David Gray, even if Dr. Gray himself rarely saw the Plaintiff. The Court concludes that the ALJ did not confuse the two Dr. Grays' roles, and the ALJ's decision to give greater weight to evidence given by a "team" that treated the Plaintiff over a longer period of time (rather than to evidence based on only a single examination) is proper. No error occurred here.

**Issue 7:      Did the ALJ fully and fairly develop the record?**

Plaintiff argues at page 10 of his brief that his representative at the hearing was a non-attorney and that neither the non-attorney nor the ALJ fully developed the record. However, this argument is stated in a conclusory manner, and there is no showing by

-20-

Plaintiff that the record failed to include medical evidence from any physician that could and should have been a part of the record but was not a part of the record.

An ALJ does have a duty to develop a claimant's medical record, and thus may be required to consult medical advisors where that record appears to be incomplete.  20 C.F.R. § 416-912(d) 2000; *Flener ex rel. Flener v. Barnhart,* 361 F.3d 442 (7th Cir. 2004); *Henderson v. Apfel,* 179 F.3d 507, 513 (7th Cir. 1999).  However, the primary responsibility for producing medical evidence demonstrating the severity and impairment remains with the claimant.  20 C.F.R. § 416-912(c) 2000.  The Seventh Circuit has recognized that because it is always possible to identify one more test or examination, an ALJ might have sought the ALJ's reasoned judgment on how much evidence to gather should generally be respected. *Luna v. Shalala,* 22 F.3d 687 (7th Cir. 1994).

In this case, Plaintiff has not come forward or demonstrated that there was any additional medical evidence available which would have demonstrated the severity of Plaintiff's impairment.  In reviewing the evidence before the ALJ, Plaintiff has not pointed to any medical testimony or evidence that was omitted by the ALJ in her consideration. Given the fact that there were consultative examinations already a part of this record, the ALJ did not commit error in failing to seek more medical examinations or medical evidence. There is no error in this regard.

### VII.  Conclusion

Plaintiff's impairments of severe back pain did not equal any listed impairment.  The ALJ's credibility decision was proper in this case, as was his evaluation of Plaintiff's mental impairments.  The ALJ did not err in concluding that Plaintiff could perform his past relevant work.  And the ALJ did not confuse the reports of David Gray, M.D., and Jeffrey Gray, Ph.D., nor did the ALJ fail to fully and fairly develop the record.  The decision of the Commissioner is **AFFIRMED,** and this case is **DISMISSED, with prejudice.**

       **SO ORDERED.**


Dated:  **September 30, 2005.**

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana


**Electronic copies to**:

Ronald Warrum
warrum@evansville.net

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov